**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* PATRICK LUPINETTI, *et al*.<br><br><br><br>Plaintiffs,<br><br>v.<br><br>EXELTIS USA, INC., AVION PHARMACEUTICALS, LLC, MISSION PHARMACAL COMPANY, VERTICAL PHARMACEUTICALS, LLC, and WOMEN'S CHOICE PHARMACEUTICALS LLC<br><br>Defendants. | Case No. 19-cv-00825<br><br><br>HON. THOMAS M. DURKIN |

**RELATOR'S RESPONSE**
**IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 1

BACKGROUND FACTS ................................................................................ 4

RELEVANT LAW .......................................................................................... 5

    A.  The False Claims Act ...................................................................... 5

    B.  Medicaid Regulations Concerning Prenatal Vitamins ........................... 6

    C.  Regulations Concerning "Rx Only"................................................... 6

LEGAL STANDARD....................................................................................... 6

ARGUMENT ................................................................................................... 7

I.   Relator's Complaint Adequately Alleges that Defendants Violated the FCA.............. 7

    A.  Relator Sufficiently Alleges that Defendants Made False
        Statements…………………………………………………………...….8

    B.  Relator Sufficiently Alleges that False Claims were Submitted to the
        Government…………………………………………………………11

    C.  Relator Sufficiently Alleges that Defendants' False Statements are
        Material…………………………………………………………….…13

    D.  Relator Sufficiently Pleads Knowledge Under the
        FCA…………………………………………………………………18

II.  The Public Disclosure Bar Does Not Apply Here. ...................................... 21

    A.  The "Critical Elements" of the Alleged Fraud Were Not Publicly
        Disclosed……………………………………………………………22

    B.  Relator's Allegations Are Not "Based Upon" a Public
        Disclosure…………………………………………………….……24

    C.  Relator Qualifies as an Original Source…………………………………26

III. Any Dismissal Should Be Without Prejudice............................................ 28

CONCLUSION................................................................................................ 29

## **TABLE OF AUTHORITIES**

**Cases**                                                                                        **Page(s)**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................7

*U.S. ex rel. Baltazar v. Warden*,
    635 F.3d 866 (7th Cir. 2011) ........................................................................24

*United States ex rel. Banigan v. Organon USA, Inc.*,
    2013 WL 4786323 (S.D. Tex. Sept. 6, 2013) ...........................................20

*United States ex rel. Campie v. Gilead Scis., Inc.*,
    862 F.3d 890 (9th Cir. 2017) ...................................................................16, 17

*Cause of Action v. Chicago Transit Auth.*,
    815 F.3d 267 (7th Cir. 2016) ..................................................................22, 28

*United States ex rel. Chilcott v. KBR, Inc.*,
    2013 WL 5781660 (C.D. Ill. Oct. 25, 2013)...............................................20

*Cook Cty., Ill. v. U.S. ex rel. Chandler*,
    538 U.S. 119 (2003)........................................................................................5

*United States ex rel. Derrick v. Roche Diagnostics Corp.*,
    318 F. Supp. 3d 1106 (N.D. Ill. 2018) ..........................................................7

*U.S. ex rel. El-Amin v. George Washington Univ.*,
    2005 WL 3275997 (D.D.C. Aug. 31, 2005) ...............................................20

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
    842 F.3d 103 (1st Cir. 2016)........................................................................16

*U.S. ex rel. Geschrey v. Generations Healthcare*,
    922 F. Supp. 2d 695 (N.D. Ill. 2012) ......................................................7, 13

*U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*,
    680 F.3d 933 (7th Cir. 2012) ......................................................................23

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
    559 U.S. 280 (2010).....................................................................................22

*United States ex rel. Gray v. UnitedHealthcare Ins. Co.*,
    2018 WL 2933674 (N.D. Ill. June 12, 2018) ........................................17, 18

*U.S. ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.*,
    895 F. Supp. 2d 872 (N.D. Ill. 2012) .........................................................29

*United States ex rel. Gudur v. Deloitte Consulting LLP*,
    512 F. Supp. 2d 920 (S.D. Tex. 2007) ...................................................................21

*United States ex rel. Heath v. Wisconsin Bell Inc.*,
    272 F. Supp. 3d 1094 (E.D. Wis. 2017)..........................................................17, 25

*U.S. ex rel. Heath v. Wisconsin Bell, Inc.*,
    760 F.3d 688 (7th Cir. 2014) ....................................................................................25

*United States ex rel. Howard v. KBR, Inc.*,
    471 F. Supp. 3d 846 (C.D. Ill. 2020) ......................................................................26

*Kennard v. Comstock Res., Inc.*,
    363 F.3d 1039 (10th Cir. 2004) ................................................................................26

*U.S. ex rel. Kennedy v. Aventis Pharms., Inc.*,
    512 F. Supp. 2d 1158 (N.D. Ill. 2007) ................................................................6, 7

*U.S. ex rel. Lamers v. City of Green Bay*,
    168 F.3d 1013 (7th Cir. 1999) .................................................................... *passim*

*Leveski v. ITT Educ. Servs., Inc.*,
    719 F.3d 818 (7th Cir. 2013) ............................................................................13, 27

*United States ex rel. Lusby v. Rolls-Royce Corp.*,
    570 F.3d 849 (7th Cir. 2009) ......................................................................7, 13, 19

*Mann v. Vogel*,
    707 F.3d 872 (7th Cir. 2013) ......................................................................................7

*U.S. ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943)....................................................................................................22

*United States ex rel. McGee v. IBM Corp.*,
    81 F. Supp. 3d 643 (N.D. Ill. 2015) ................................................................19, 27

*United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*,
    507 F. Supp. 3d 734 (W.D. Tex. 2020)..................................................................17

*United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*,
    892 F.3d 822 (6th Cir. 2018) ...................................................................................16

*United States ex rel. Prose v. Molina Healthcare of Illinois, Inc.*,
    2020 WL 3050342 (N.D. Ill. June 8, 2020) .........................................................18

*Ruckh v. Salus Rehabilitation*,
    963 F.3d 1089 (11th Cir. 2020) ........................................................................15, 16

*Shmushkovich v. Home Bound Healthcare, Inc.*,
    2015 WL 7251934 (N.D. Ill. Nov. 17, 2015) .................................................................6, 13

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*,
    14 F.3d 645 (D.C.Cir. 1994) .......................................................................................23

*United States ex rel. Streck v. Takeda Pharms. Am., Inc.*,
    381 F. Supp. 3d 932 (N.D. Ill. 2019) ..........................................................................21

*U.S. ex rel. Trombetta v. EMSCO Billing Servs., Inc.*,
    2002 WL 34543515 (N.D. Ill. Dec. 5, 2002) ..............................................................7

*United States v. Am. at Home Healthcare & Nursing Servs., Ltd.*,
    2018 WL 319319 (N.D. Ill. Jan. 8, 2018) ...................................................................15

*United States v. Am. at Home Healthcare & Nursing Servs., Ltd.*,
    2017 WL 2653070 (N.D. Ill. June 20, 2017) ..............................................................29

*United States v. Bollinger Shipyards, Inc.*,
    775 F.3d 255 (5th Cir. 2014) ......................................................................................20

*United States v. Bornstein*,
    423 U.S. 303 (1976).....................................................................................................12

*United States v. Hodge*,
    933 F.3d 468 (5th Cir. 2019) ......................................................................................16

*United States v. King-Vassel*,
    728 F.3d 707 (7th Cir. 2013) ......................................................................................19

*United States v. Luce*,
    873 F.3d 999 (7th Cir. 2017) ...............................................................................6, 14, 15

*United States v. Pfizer Inc.*,
    2019 WL 1200753 (N.D. Ill. Mar. 14, 2019) .............................................................18

*United States v. Rite Aid Corp.*,
    2019 WL 1426333 (E.D. Mich. Mar. 30, 2019) .........................................................17

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016).....................................................................................14, 16, 17

*United States ex rel. Yannacopoulos v. General Dynamics*,
    652 F.3d 818 (7th Cir. 2010) ........................................................................................5

iv

**Statutes**

42 U.S.C.A. § 1396r-8(k)(4) ................................................................................6, 11

21 U.S.C. § 353(b)(4) ............................................................................................6

31 U.S.C. § 3729(a)(1) .....................................................................................5, 18

31 U.S.C. § 3729(b)(4) ........................................................................................14

31 U.S.C. § 3730(e)(4) ........................................................................................22

31 U.S.C. § 3730(e)(4) ........................................................................................26

42 U.S.C. § 1396r-8(d)(2)(E) ................................................................................6

Dietary Health and Education Act of 1994, Pub. L. No. 103-417, 108 Stat. 4325......................10

Fed. R. Civ. P. 15(a)(2) ......................................................................................28

**Other Authorities**

21 C.F.R. § 207.37 ................................................................................................8

*FDA Dietary Supplement Labeling Guide: Chapter VIII. Other Labeling Information,
    April 2005* ..................................................................................................10

Restatement (Second) of Torts § 538 cmt.......................................................16

Fed. R. Civ. P. 9(b) ...................................................................................... *passim*

## INTRODUCTION

Relator's *qui tam* complaint alleges systemic fraud involving the sale of falsely labeled "Rx Only" prenatal vitamins from five pharmaceutical companies: Exeltis USA, Inc.; Avion Pharmaceuticals, LLC; Mission Pharmacal Company; Vertical Pharmaceuticals, LLC; and Women's Choice Pharmaceuticals LLC ("Defendants"). For years, the Defendants have lied to physicians, pharmacists, consumers, and government regulators about their products' prescription status. As a result, government healthcare programs have paid hundreds of millions of dollars in tainted claims for Defendants' products. This case is about whether Defendants' false statements are actionable under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*

Defendants manufacture and sell prenatal vitamins. Prenatal vitamins are a type of dietary supplement intended for pregnant women. Prenatal vitamins do *not* require a prescription to be dispensed. Only drugs that have been approved as prescription only by the Food and Drug Administration ("FDA") or that are not safe for use except under a physician's supervision, legally require a prescription to be dispensed. Defendants' prenatal vitamins (like other dietary supplements) do not meet this definition and do not require a prescription to be dispensed. However, government healthcare programs, such as Medicaid, must pay for prenatal vitamins if they are prescribed from an authorized prescriber. In other words, even though a prescription is not legally required to dispense Defendants' products, an order from a practitioner *is* required to *obtain Medicaid reimbursement*.

Recognizing that a claim to prescription status will automatically trigger this Medicaid reimbursement standard, Defendants falsely identify their products as "Prescription Only" and improperly use the "Rx" and "Rx Only" markings on their labels to make it *appear* as if their

products legally require a prescription to be dispensed. All of these lies serve the same purpose: to guarantee payment from Medicaid programs and other third-party payers.

Further, Defendants' mislabeled "Rx" prenatal vitamins were designed to cost the government substantially more than over-the-counter ("OTC") prenatal vitamins that contain the same active ingredients. Defendants' products can cost *over 100 times more* than comparable OTC prenatal vitamins. And because of Defendants' fraud, pharmacies keep Defendants' "Rx" prenatal vitamins *behind the counter* with the prescription drugs. Thus, when a Medicaid beneficiary presents a prescription for prenatal vitamins, the pharmacist dispenses Defendants' "Rx" prenatal vitamins because they are behind the counter and falsely labeled prescription only.

The results are stark: Medicaid pays hyper-inflated costs for Defendants' "Rx" prenatal vitamins simply because they are falsely labeled "Rx." There is no clinical basis for dispensing Defendants' products instead of comparable OTC prenatal vitamins. Either may be covered under Medicaid if prescribed. One is simply falsely labeled "Rx" and the other is not. This scenario repeats in pharmacies across the country, costing the government millions of dollars a year.

Relator's complaint adequately alleges that Defendants' conduct violates the False Claims Act. Defendant's statements were false, they were made knowingly, they were material to government payment, and they caused false claims. The complaint provides numerous details and examples of each Defendants' false statements. This is more than sufficient to provide fair notice of the claims against each Defendant, as required under Rule 9(b).

Defendants' motion to dismiss arguments rest on a fundamental mischaracterization of this cause of action. According to Defendants, the issue is whether Defendants misrepresented that their products were FDA approved. To be sure, Defendants' products are not approved for safety and efficacy by the FDA, but this case is not about FDA approval; rather, it is about whether

Defendants mispresented that their products were prescription only. Defendants' statements are false because their products are not in any sense "prescription," and should not be kept behind the counter with legitimate prescription drugs.

Defendants' products cannot be prescription prenatal vitamins in the same sense that an over-the-counter aspirin cannot be labeled "Prescription Aspirin." Such a claim would be false and is prohibited as misbranding. If Defendants are permitted to apply the "Rx" designation to their vitamin products, then anyone can do likewise, and the word "prescription" – a term with legal status and professional requirements regarding safe use – would become meaningless. Federal law and regulations cannot be interpreted as incorporating a meaningless standard, and the rules of the Medicaid program cannot be interpreted to recognize the illegitimate appropriation of the "Rx Only" marking.

To divert attention from their false "Rx" labeling, Defendants highlight irrelevant considerations: that prescription prenatal vitamins "are important" – a fact not in dispute and not at issue; that federal regulations mandate reimbursement of prescription prenatal vitamins – again, not an issue in question; and that if Defendants are prevented from misrepresenting their products, patients will "lose access" to prenatal vitamins – an unsupported claim that Defendants know to be untrue.

To be clear, there is no way in which the outcome of this case could prevent women from obtaining legitimate prenatal vitamins when prescribed by an authorized prescriber. Federal law mandates such coverage. Defendants present a false choice that Medicaid must choose between either zero prenatal vitamin coverage or Defendants' mislabeled and exorbitantly expensive products.

Defendants also incorrectly argue that the FCA's "public disclosure bar" forecloses this *qui tam* suit. None of the "disclosures" that Defendants reference reveal that Defendants' products *should not have been labeled "Rx" or "Rx Only."* Or that Defendants' practices *caused* pharmacists, physicians, and consumers to believe that Defendants' products required a prescription. Or that Defendants' false statements to drug compendia companies were intended to fraudulently facilitate Medicaid reimbursement. Had it not been for Mr. Lupinetti's independent and substantial efforts, Defendants' fraud would remain undetected. The public disclosure bar does not apply here. Defendants' motion to dismiss should be denied.

## BACKGROUND FACTS

This *qui tam* lawsuit is based on Mr. Lupinetti's insider industry experience at First DataBank and his broad experience fighting healthcare fraud in the New York Attorney General's Office. *See e.g.*, Amended Complaint ("Am. Compl.") at ¶¶ 2-3. Mr. Lupinetti discovered Defendants' fraud while working as a Sr. Vice President at First DataBank. *Id*. at ¶¶ 2-3, 14-15. First DataBank compiles drug information and provides that information to paying subscribers, such as pharmacies, insurance companies, and government agencies. *Id*. at ¶¶ 65-67. Third-party payers rely on this information to make payment decisions. *Id*. Relator recognized that the prescription information Defendants submitted to First DataBank was false and could lead to the submission of false claims for payment. *Id*. at ¶¶ 68-70.

Mr. Lupinetti conducted an investigation at First DataBank to confirm Defendants' practices. *Id*. at ¶ 71. Relator's position provided him with access to industry-wide drug information, pricing data, and the ability to communicate with pharmaceutical companies, pharmacists, and other key stakeholders. *Id*. at ¶ 15. This investigation confirmed that there was no valid basis to classify Defendants' products as "prescription only." *Id*. at ¶ 71. Relator's

investigation also confirmed that Defendants' false prescription status impacted government and private healthcare reimbursement. *See id.* at ¶¶ 5, 18, 89-93.

Relator's efforts were not merely academic. Because of his investigation, First DataBank announced a significant change in how it classifies prenatal vitamins. *Id.* at ¶¶ 71, 87. No longer would First DataBank allow Defendants to falsely represent their products as requiring a prescription. *Id.* In response, certain Defendants sued First DataBank to prevent it from changing how it classifies prenatal vitamin products. *Id.*

## **RELEVANT LAW**

### **A. The False Claims Act**

The FCA was designed "to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook Cty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003). Among its provisions, the FCA mandates that any person who:

> (A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or
>
> (B) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.
>
> Is liable to the United States for a civil penalty [inflation adjusted] plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

"To establish civil liability under the [FCA], a relator generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 822 (7th Cir. 2010). An FCA case must also allege that the false statement or omission is "material." What matters is "whether the defendant knowingly violated a requirement that *the defendant knows is material* to the Government's

payment decision." *United States v. Luce*, 873 F.3d 999, 1009 (7th Cir. 2017) *quoting Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) (emphasis in *Luce*). State false claims acts track the federal FCA and are generally interpreted identically. *See, e.g., U.S. ex rel. Kennedy v. Aventis Pharms., Inc.*, 512 F. Supp. 2d 1158, 1163, fn. 2 (N.D. Ill. 2007) (case law regarding the federal FCA is applicable to parallel state statutes).

### B.  Medicaid Regulations Concerning Prenatal Vitamins

Federal law requires that state Medicaid programs cover prenatal vitamins. 42 U.S.C. § 1396r-8(d)(2)(E). However, Medicaid will only cover over-the-counter (or "Nonprescription drugs") "if they are prescribed by a physician (or other person authorized to prescribe under State law)." 42 U.S.C.A. § 1396r-8(k)(4). Thus, prenatal vitamins must be prescribed by an authorized prescriber to be covered by the Medicaid program. Defendants' false prescription-only status ensures Defendants' products will be covered under all state Medicaid programs.

### C.  Regulations Concerning "Rx Only"

The term "Rx Only" has legal significance. If a drug is approved as prescription only or is safe for use only under physician supervision, the drug *must* bear the "Rx Only" marking. 21 U.S.C. § 353(b)(4)(A). Conversely, any drug that *does not* require the "Rx Only" marking—like Defendants' prenatal vitamins—shall not bear the "Rx Only" marking and is "deemed to be misbranded if at any time prior to dispensing the label of the drug bears the symbol." 21 U.S.C. § 353(b)(4)(B).

### <u>LEGAL STANDARD</u>

To defeat a motion to dismiss, Relator's complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Shmushkovich v. Home Bound Healthcare, Inc.*, 2015 WL 7251934, at *1 (N.D. Ill. Nov. 17, 2015), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when "the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013).

The FCA is an anti-fraud statute and claims under it are subject to the pleading requirements of Rule 9(b). Rule 9(b) requires a plaintiff to state with particularity the circumstances constituting fraud or mistake, namely, the who, what, when, where, and how. *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009). In reviewing Rule 9(b) challenges, "[t]he critical question is whether [the relator's] allegations are sufficient to inform each defendant of the nature of his alleged participation in the fraud." *United States ex rel. Derrick v. Roche Diagnostics Corp.*, 318 F. Supp. 3d 1106, 1114 (N.D. Ill. 2018) (internal quotation marks omitted). "It is well established . . . that the requirements of Rule 9(b) are relaxed when the plaintiff lacks access to all facts necessary to detail his claim." *U.S. ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1167 (N.D. Ill. 2007). Put differently, a relator is not expected to plead information to which the relator does not reasonably have access. *U.S. ex rel. Geschrey v. Generations Healthcare*, LLC, 922 F. Supp. 2d 695, 706 (N.D. Ill. 2012). Moreover, the pleading standard is relaxed where, as here, a relator alleges a long-lasting and wide-ranging scheme. *See U.S. ex rel. Trombetta v. EMSCO Billing Servs., Inc.*, 2002 WL 34543515, at *3 (N.D. Ill. Dec. 5, 2002).

## ARGUMENT

### I.    Relator's Complaint Adequately Alleges that Defendants Violated the FCA.

Relator's complaint describes Defendants' scheme in detail, provides numerous examples of Defendants' false statements, and gives fair notice to each of the Defendants of the allegations against them. This is more than sufficient to defeat Defendants' motion to dismiss. Defendants

argue that Relator did not allege: (1) that Defendants made false statements, (2) that false claims were submitted to the Government, (3) that Defendants false statements were material, and (4) that Defendants acted with the requisite knowledge. Defendants also tack on to their scienter argument that Relator "lumps all defendants together." These arguments are wrong. Relator addresses each in turn and then addresses Defendants' incorrect public discourse arguments.

### A. Relator Sufficiently Alleges That Defendants Made False Statements.

Relator's allegations regarding Defendants' false statements are clear and pled with specificity. First, Relator alleges that Defendants have falsely represented that their products are prescription only by improperly using the "Rx" or "Rx Only" marking on their products, websites, and other marketing material. Am. Compl. at ¶ 36. As alleged: "FDA regulations strictly control what drug products can legally bear 'Rx Only' markings. Dietary supplements, including Defendants' vitamins, cannot legally bear an 'Rx Only' marking." *Id.* at ¶¶ 39-40. "The use of 'Rx' or 'Rx Only' is limited to drugs that have been approved as prescription only by the FDA or that are not safe for use except under a physician's supervision." *Id*. Defendants' representations that their products are prescription drugs are therefore false and Relator has adequately alleged that Defendants made false statements. Relator supports these allegations with specific examples of false statements from each Defendant. *Id.* at ¶¶ 45-46; Ex. B.

Next, Relator alleges that Defendants "improperly used National Drug Codes (NDC) to make it appear as if their products are approved prescription products…" *Id.* at ¶ 36. Relator explains: "'[a] product may be deemed to be misbranded if an NDC is used' on 'products that are not subject to parts 207, 607 of this chapter, or 1271 of this chapter, *such as dietary supplements* and medical devices.' 21 C.F.R. § 207.37 (effective November 29, 2016) (emphasis supplied)." *Id* at ¶¶ 48-49. Therefore, "[b]ecause Defendants' products are dietary supplements, not drugs, Defendants are not permitted to display an NDC on their products." *Id*. Relator includes

representative examples from each Defendant, showing their misuse of NDC numbers. *Id.* at ¶¶ 46, 52; Ex. B.

Relator further alleges that Defendants "misrepresented their products' prescription status to CMS, state healthcare programs, and to First Databank and other drug compendia companies." *Id.* at ¶ 36. As alleged, Defendants have consistently misrepresented to CMS their drug type indicator, misrepresenting "that their prenatal vitamins were '1 = Rx,' meaning that they require a prescription." *Id.* at ¶ 59-60. These representations are false because Defendants' products do not require a prescription to be dispensed. *Id.* at ¶¶ 63-65. Because Relator worked at First DataBank, he understood the significance of Defendants' false statements and how they were communicated: "Defendants took advantage of First Databank's procedures and submitted false and misleading information so that their products would be identified as 'prescription' products eligible for Medicaid reimbursement. Defendants' misrepresentations were submitted to First Databank on written forms and in communications with First Databank employees." *Id.* at ¶ 68.

Defendants' arguments largely ignore these false statements and instead focus on whether Defendants misrepresented "FDA approval." Defs. Br. at 16-17; *see also* 7 ("All of Relator's claims rest on the same theory: He claims that seeking reimbursement for Defendants' prescription prenatal vitamins is false and fraudulent under the FCA *because those vitamins are not FDA approved*.") (emphasis supplied).[1] But this case is not just about FDA approval – it is about whether Defendants lied about their prescription only status. *See* Am. Compl. at ¶¶ 39-44.

As to their "prescription only" status, Defendants disingenuously argue that there is nothing "actually false" about labeling their products "Rx or telling CMS they are prescription products."

---

[1] "Defendants' Joint Memorandum of Law in Support of Their Motions to Dismiss the First Amended Complaint" (Dkt. # 47) is referred to as Defs. Br.

Defs. Br. at 16. Defendants provide no basis for this position other than a footnote in the Background section of their brief that cites a notice in the Federal Register, dated August 2, 1973. Defs. Br. p. 6 at fn. 4. According to Defendants, it was because of this notice in 1973 that "Prenatal vitamin manufacturers started selling their products as prescription products [because] the FDA stated that prescriptions were required for products with over 800 micrograms of folic acid." *Id*.

Defendants are wrong for several reasons. *First*, the notice primarily discusses whether products with high levels of folic acid are required to obtain *FDA approval* – no Defendants have done that. *Second*, the notice was never made into law. *Third*, any authority the notice may have had was nullified when Congress passed the Dietary Health and Education Act of 1994 ("DSHEA"), Pub. L. No. 103-417, 108 Stat. 4325 (codified as amended in scattered sections of 21 U.S.C.). DSHEA establishes the relevant standards for dietary supplements including Defendants' prenatal vitamins. And *fourth*, the FDA has repeatedly recognized under DSHEA that there are no limits on the amount of folic acid a dietary supplement may contain. This means whether a vitamin contains 400 micrograms or 1,000 micrograms makes no difference.[2]

The only other authority Defendants cite is a case involving illegal kickbacks. Defs. Br. at 16-17 citing *United States ex rel. Suarez v. Abbvie Inc.*, 2019 WL 4749967, at *7 (N.D. Ill. Sept. 30, 2019). This case has nothing to do with whether Defendants' products may use the "Rx" or

---

[2] *See*, *e.g.*, *FDA Dietary Supplement Labeling Guide: Chapter VIII. Other Labeling Information, April 2005* ("Is there a limit on the folic acid content in dietary supplements? No. FDA does not specify any limit on the folic acid content that may be contained in dietary supplements.") Available at: https://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/DietarySupplements/ucm070616.htm#8-6

Numerous health authorities, such as the Centers for Disease Control and Prevention ("CDC"), recommend that women take a prenatal vitamin with 400 micrograms of folic acid daily during pregnancy. Am. Comp. ¶ 75; *see also* CDC website available at: https://www.cdc.gov/pregnancy/during.html ("Take a vitamin with 400 micrograms (mcg) of folic acid every day, before and during pregnancy.") Virtually all prenatal vitamins contain, at minimum, the recommend amount of folic acid.

"Rx Only" marking. Further, the *Suarez* court ultimately denied defendant's motion to dismiss after granting relator leave to file a second amended complaint. *United States ex rel. Suarez v. AbbVie*, Inc., 503 F. Supp. 3d 711, 726 (N.D. Ill. 2020).

More generally, Defendants twist the federal requirements mandating coverage for prenatal vitamins into making it seem like there is tacit approval of Defendants' false use of "Rx Only." This position makes no sense. All "covered outpatient drugs," whether prescription or OTC, must be prescribed by an authorized prescriber to be eligible for payment under the Medicaid program. *See* 42 U.S.C.A. § 1396r-8(k)(4). This means that when Congress mandated coverage for prenatal vitamins, it required states to cover prenatal vitamins that were prescribed by an authorized prescriber. It did *not* grant Defendants' carte blanche to mislabel their products as "Rx Only."

In sum, Defendants' arguments completely ignore the bulk of Relator's complaint. *See*, *e.g.*, Am. Compl. at ¶¶ 34-79. If the word "prescription" has any meaning – and federal and state penalties for the unlawful dispensing of prescription products demonstrate that it does – there is no sense in which it is accurately applied to Defendants' products. They are not prescription products, but merely masquerade as such. Relator has sufficiently pleaded that each of the Defendants made false statements.

### B. Relator Sufficiently Alleges that False Claims were Submitted to the Government.

Relator alleges that the government paid hundreds of millions of dollars in claims for Defendants' falsely labeled "Rx" prenatal vitamins. *See, e.g.*, Am. Compl. at ¶¶ 5-6, 34, 47, 88-93. There are several ways in which the Defendants caused the submission of these false claims to the government.

First, because Defendants' products were falsely labeled "Rx" or "Rx Only," pharmacies kept Defendants' products *behind the counter* with the prescription drugs. This *behind the counter* status caused pharmacists to dispense Defendants' "Rx" products when patients presented a

prescription for prenatal vitamins instead of OTC versions with the same active ingredients. *Id.* at ¶ 78.

Second, Defendants' false submissions to First Databank and other drug compendia companies caused the submission of false claims. The data from these companies is used to electronically adjudicate claims. Because Defendants provided false information to the drug compendia companies (and to CMS and the FDA), third party payers relied on false information to process claims for Defendants' "Rx" prenatal vitamins. *Id.* at ¶¶ 57-60. As the adjudication process is largely computerized and automated, the Defendants' false submissions practically guaranteed reimbursement for Defendants' products. *Id.* at ¶¶ 73-74.

And third, Defendants' fraud naturally leads physicians to prescribe Defendants' "Rx" products and thus leads to the submission of claims for Medicaid reimbursement. *Id.* at ¶¶ 75-77. This is because Defendants' lies caused physicians and other prescribers to believe that Defendants' "Rx" products *legally required* a prescription to be dispensed. *Id.* Physicians had no reason to believe that Defendants' "Rx Only" marking was a sham. *Id.* These allegations sufficiently allege that Defendants caused the submission of false claims. *See United States v. Bornstein*, 423 U.S. 303, 313 (1976) (defendant subcontractor "caused" prime contractor "to submit false claims to the United States" by introducing "falsely branded" parts into products purchased by the Government).

Defendants are wrong to suggest that "mere labeling" and false statements to drug compendia companies and CMS are not "associated with any actual claim," and so "are not actionable under the FCA." Defs. Br. at 14. Defendants' false statements concerning prescription status are clearly associated with claims to government payers that depend on a prescription for reimbursement, particularly because Defendants' scheme succeeded in causing the submission of

12

tens of thousands of false claims worth hundreds of millions of dollars. Am. Compl. at ¶ 73. Relator specifically alleged that the Medicaid program paid nearly $60 million for Defendants' products in 2019 alone. *Id.* at ¶ 18. These are not hypothetical claims – these are actual claims for Defendants' false "Rx" products paid for with taxpayer funds.

Moreover, there is no need to allege "billing minutia" to satisfy Rule 9(b). *Shmushkovich v. Home Bound Healthcare, Inc.*, 2015 WL 7251934, at *6 (N.D. Ill. Nov. 17, 2015) (Durkin, J.); *see also Lusby*, 570 F.3d at 854-55 (it is not "essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit… It is enough to show, in detail, the nature of the charge…"). "These allegations also satisfy Rule 9(b) because they sufficiently identify the 'circumstances' of the false claims such that [Defendants] 'can respond effectively, and [the Court] can set an appropriate course for the litigation process.'" *Shmushkovich*, 2015 WL 7251934, at *4 (quoting *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 949 (7th Cir. 2013)).

At the very least, Relator alleges sufficient facts from which the Court can draw an inference that Defendants caused the submission of false claims to the government. *See U.S. ex rel. Geschrey v. Generations Healthcare, LLC*, 922 F. Supp. 2d 695, 705-06 (N.D. Ill. 2012) (stating that relators' complaint "makes the alleged fraud in the billing process sufficiently clear to allow Defendants to respond to the allegations," and finding a strong inference that bills for the care of patients as to whom fraud has been alleged were submitted to the government); *See also Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 838-39 (7th Cir. 2013) ("we reaffirmed that a relator need not produce a copy of the actual document making the false claim at the outset of the lawsuit"; "[f]or now, an inference is enough").

### C. Relator Sufficiently Alleges that Defendants' False Statements Are Material.

It is hard to imagine that lying to pregnant women about the prescription status of prenatal vitamins could be deemed a minor noncompliance with federal and state statutes and regulations.

If compliance were not material to the Government, why would the Government prohibit companies from misbranding products with the "Rx Only" marking? Moreover, if a prescription from an authorized prescriber is *required* for Medicaid reimbursement, how could Defendants' misrepresentation of their products' prescription status be immaterial? And if it were so minor or inconsequential, why would Defendants go to such lengths as filing a lawsuit to try to prevent First DataBank from providing the correct information in its database? Relator has plausibly alleged materiality.

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). This is a holistic standard, and case law involving materiality focuses on several factors. The Supreme Court in *Escobar* confirmed that conduct is generally material in at least two circumstances: (1) if a reasonable person would attach importance to it in making a decision or (2) if the defendant knew that "the recipient of the representation attaches importance to the specific matter." 136 S. Ct. at 2002-2003. The *Escobar* Court also recognized that multiple factors may be considered and that "materiality cannot rest on a single fact or occurrence as always determinative." *Id.* at 2001 (internal quotations and citation omitted). Other factors include: (1) whether the government has designated "compliance with a particular . . . requirement as a condition of payment," *id.* at 2003; (2) whether the violation of that requirement goes to the "essence of the bargain," *id.* at 2003 n.5; (3) whether the violation is significant, *id.* at 2003; and (4) whether and how the government acted when it had actual knowledge of similar violations. *Id.* at 2003-04; *see also United States v. Luce*, 873 F.3d 999, 1009 (7th Cir. 2017) *quoting Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) (focusing on "whether the defendant knowingly violated a requirement that *the defendant knows is material* to the Government's payment decision")

14

(emphasis in *Luce*); *see also Ruckh v. Salus Rehabilitation*, LLC, 963 F.3d 1089, 1105-06 (11th Cir. 2020) (materiality is "plain and obvious" where the defendant artificially maximizes reimbursement or upcodes healthcare services); *United States v. Am. at Home Healthcare & Nursing Servs., Ltd.*, 2018 WL 319319, at *7 (N.D. Ill. Jan. 8, 2018) (relator sufficiently pled materiality where defendant's alleged violations of the Health Insurance Portability and Accountability Act (HIPAA) "subjects patients to abusive marketing practices and unnecessary care from providers that they trust to help them").

Here, given that Medicaid reimbursement *requires* a prescription, Defendants' false use of the "Rx Only" marking would plainly go to the heart of the materiality inquiry. Defendants' false prescription status effectively guarantees Medicaid reimbursement through the automated adjudication process. Am. Compl. at ¶ 74. It also subjects patients to "abusive marketing practices" – *i.e.*, false "Rx" labeling and marketing – as in *Home Healthcare & Nursing Servs., Ltd.*, 2018 WL 319319, at *7.

Defendants' false submissions to First DataBank and other drug compendia companies are also material to the Government. Defendants' *actual knowledge* of materiality is underscored in Defendants' reactions to First DataBank's efforts to correctly code Defendants' prenatal products. *Id*. at ¶¶ 71, 87. It was because the Defendants knew these false statements were material to the Government that Defendants fought First Databank from changing their products' "prescription only" status. *Id*.

Relator also pled examples of how the Government acted when it had knowledge of similar violations. *Id*. at ¶¶ 43, 83-84. The FDA has repeatedly warned companies against misbranding products with "Rx Only" markings and marketing dietary supplements that combine drug products with vitamins. *Id*.; *see also* ¶ 46, fn 4 ("Certain of Defendant Mission's prenatal products, such as

15

CitraNatal 90 DHA, combine dietary supplement ingredients with the active drug ingredient docusate sodium… [T]he FDA has forbidden manufacturers from marketing these combination products as dietary supplements"). Moreover, prescription drugs must be provided economically and only when medically necessary, so the false use of "Rx" to get paid substantially higher amounts for Defendants' products is material. *Id.* at ¶¶ 88-93. *See Ruckh*, 963 F.3d at 1105-06 (11th Cir. 2020) (materiality is "plain and obvious" where the defendant's fraud caused the government to pay out "higher amounts" than what was truly owed).

Considering a holistic analysis of the relevant factors, Relator has sufficiently pled materiality under the "reasonable person" standard or looking at what the Defendants know to be material. Each of the *Escobar* factors support materiality. Moreover, it would be premature to decide materiality on a motion to dismiss given these well-pled allegations. The materiality inquiry should be left for the trier of fact after discovery. *Cf.* Restatement (Second) of Torts § 538 cmt. e (1977) (recognizing that a misrepresentation's materiality often depends on the jury's assessment of what is reasonable); *see also United States v. Hodge*, 933 F.3d 468, 474 (5th Cir. 2019) (explaining that the materiality inquiry's holistic nature can render it inappropriate for resolution as a matter of law); *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 831-37 (6th Cir. 2018) (same); *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 904-06 (9th Cir. 2017) (same); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109-12 (1st Cir. 2016) (same).

Defendants' only argument to the contrary is that "CMS has expressly stated that it intends to pay for prescription prenatal vitamins, and that States may not exclude them from coverage, regardless of their FDA-approval status." Defs. Br. at 18. This case is not about "FDA-approval status," so Defendants' point has little relevance. Further, there are numerous reasons unrelated to

the materiality analysis that may explain why the Government continues to purchase prenatal vitamins, including the fact that Congress *requires* Medicaid to cover prenatal vitamins. "Healthcare administration is complicated. The Government does not enjoy the luxury of refusing to reimburse health care claims the moment it suspects there may be wrongdoing. Thus, the Government's continued payment despite knowledge of Relators' allegations does not necessarily imply immateriality." *United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 767 (W.D. Tex. 2020) (internal quotations and citations omitted); *see also United States v. Rite Aid Corp.*, 2019 WL 1426333, at *7 (E.D. Mich. Mar. 30, 2019) (rejecting argument that "government's continued payments of [defendant's] claims after learning of Relator's allegations … demonstrate a lack of materiality."); *United States ex rel. Campie v. Gilead Scis.*, Inc., 862 F.3d 890, 906 (9th Cir. 2017) (same, noting "there are many reasons the FDA may choose not to withdraw a drug approval, unrelated to the concern that the government paid out billions of dollars for nonconforming and adulterated drugs.").

Defendants are also wrong to assign dispositive weight to this single factor. Had the *Escobar* Court intended materiality to turn solely on whether the government would have denied payment had it known of mere allegations of fraud, it would have been unnecessary for the Supreme Court to identify any other factors relevant to the multi-pronged materiality inquiry. *See United States ex rel. Heath v. Wisconsin Bell Inc.*, 272 F. Supp. 3d 1094, 1097–98 (E.D. Wis. 2017) ("The government's apparent ambivalence is insufficient to prove that Wisconsin Bell's allegedly fraudulent statements about its compliance with the LCP requirement are immaterial.").

Defendants also rely on *United States ex rel. Gray v. UnitedHealthcare Ins. Co.*, 2018 WL 2933674, at *6 (N.D. Ill. June 12, 2018) to mistakenly compare "in-home examinations" used by some Medicare Advantage plans with reimbursement for Defendants' false "Rx" prenatal

vitamins. Defs. Br. at 18-19. This comparison makes no sense. In *Gray*, the Government did *not* pay for "in-home examinations"; rather, the examinations allegedly led to greater "risk adjustment data," which in turn led to higher "capitated payments" to Medicare Advantage plans. *Id*. at *2-3. These facts and the "capitated payment" framework are irrelevant here and have no bearing on the materiality analysis.[3]

Relator has sufficiently alleged that Defendant's false statements are material.

### D.  Relator Sufficiently Pleads Knowledge Under the FCA.

The FCA proscribes "knowing" misconduct. 31 U.S.C. § 3729(a)(1). The term "knowing" encompass three separate standards of scienter. A party acts "knowingly" when it: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). The FCA does *not* require proof of specific intent to defraud. *Id*. This statutory language establishes three distinct states of mind, each of which is independently sufficient to support a finding of liability under the FCA.

Additionally, Rule 9(b) provides that "knowledge, and other conditions of a person's mind may be alleged generally." To plead scienter, a relator "need only show that [defendant] had reason to know of facts that would lead a reasonable person to realize that she was causing the submission of a false claim" or "that [defendant] failed to make a reasonable and prudent inquiry into that

---

[3] Defendants also cite *United States v. Pfizer Inc.*, No. 16-CV-7142, 2019 WL 1200753, at *8 (N.D. Ill. Mar. 14, 2019) and *United States ex rel. Prose v. Molina Healthcare of Illinois, Inc.*, No. 17 C 6638, 2020 WL 3050342, at *7 (N.D. Ill. June 8, 2020). Both are easily distinguishable. In *Pfizer*, the relator failed to explain why the purported regulatory violations were material to Government payment. In *Prose*, the relator failed to allege facts supporting defendant's knowledge of materiality. Relator has allged that information in detail here. *See*, e.g., Am. Comp. ¶¶ 80-99.

possibility." *United States v. King-Vassel*, 728 F.3d 707, 713 (7th Cir. 2013); *United States ex rel. Chandler*, 277 F.3d at 976 (noting that Congress "changed the knowledge element of the offense, making success more likely" by setting "a fairly low standard"); *see also United States ex rel. Lusby*, 570 F.3d at 854 (recognizing that knowledge in *qui tam* suits is often "inferential"); *see also United States ex rel. McGee v. IBM Corp.,* 81 F. Supp. 3d 643, 668 (N.D. Ill. 2015).

Here, multiple allegations in Relator's complaint sufficiently allege that Defendants acted knowingly. Defendants are sophisticated pharmaceutical companies with specialized knowledge in the dietary supplement area. Am. Compl. ¶ 95. This is no mere oversight or mistake, "Defendants know, a product labeled 'Rx Only' will trigger computerized and automated claims processing systems to regard these vitamins as products for which Medicaid reimbursement was mandatory." *Id.* at ¶¶ 74, 96. Defendants also know that their mislabeling "caused doctors and pharmacists to believe that Defendants' products were somehow different" than comparable OTC vitamins. *Id.* at ¶ 74. Defendants' salespeople touted Defendants' products to healthcare providers to encourage the prescribing of their false "Rx" prenatal products. *Id.* at ¶¶ 76-78. Defendants also know that pharmacists store Defendants' "Rx" products behind the counter and that this scheme guarantees that Defendants' products will be prescribed, dispensed, and paid for by government healthcare programs. *Id.* at ¶ 79.

Defendants' knowledge can also be inferred from the clear profit motive in guaranteeing that its products obtain Medicaid reimbursement. *See U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999) (noting that "financial motive" could provide support for a knowing violation). Defendants have made millions of dollars at the taxpayers' expense because of their false representations. *Id.* at ¶ 96. All of the foregoing supports Relator's allegations that Defendants' scheme was knowingly orchestrated.

Further, knowledge is a question of fact and is not properly resolved at the pleading stage (or even summary judgment stage) of litigation. *See e.g.*, *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260-61 (5th Cir. 2014) (reversing district court's grant of summary judgment to defendant and finding that "the district court erred by requiring the United States to plead the FCA's knowledge element with particularity under Rule 9(b)"); *U.S. ex rel. El-Amin v. George Washington Univ.*, 2005 WL 3275997, at *9 (D.D.C. Aug. 31, 2005) (holding that factual disputes regarding defendant's intent precluded summary judgment for either party, and explaining that "[w]eighing such evidence is not appropriate at the summary judgment stage"); *United States ex rel. Chilcott v. KBR, Inc.*, 2013 WL 5781660, at *6 (C.D. Ill. Oct. 25, 2013) (denying defendant's motion to dismiss and explaining that the "Court's only role at [the pleadings] stage is to determine whether Plaintiff's allegations, taken as true, are sufficient to raise a claim under the FCA"); *United States ex rel. Banigan v. Organon USA, Inc.*, 2013 WL 4786323, at *8 (S.D. Tex. Sept. 6, 2013) ("The majority of courts have held that it is inappropriate to decide a scienter issue, e.g. whether [the defendant] had a good faith interpretation of the statute that would negate the intent necessary for an FCA violation, at the pleading stage of the litigation.").

Defendants contend that Relator cannot plead knowledge because Defendants merely did what "Congress told them to do: seek reimbursement for prescription prenatal vitamins regardless of their status with the FDA." Defs. Br. at 20. This argument does not comport with the facts alleged. Congress did not tell the Defendants to mislabel their products. Congress did not authorize Defendants to use the "Rx Only" marking. Defendants' arguments about their "reasonable" interpretation of their legal obligations have no basis. The law is clear that Defendants cannot mislabel their products.

Defendants also argue that "profit motive alone" isn't enough to plead the requisite

scienter, citing *United States ex rel. Gudur v. Deloitte Consulting LLP*, 512 F. Supp. 2d 920, 954 (S.D. Tex. 2007). Defs. Br. at 21-22. But Relator has not alleged the profit motive *alone*. This is one fact of many that plausibly alleges Defendants' knowledge. Am. Compl. ¶¶ 75-79. Further, *Gudur* involved a summary judgment standard, not a motion to dismiss. *Gudur*, 512 F. Supp. 2d at 954. Relator's allegations, taken as true for purposes of deciding Defendants' motions to dismiss, properly pleads the scienter element.

Lastly, Defendants contend that Relator impermissibly "lumps" all the Defendants together. This argument ignores the common fact that all Defendants mislabel their products as "prescription only." It also ignores that Relator identified distinct products and false statements for each individual Defendant, as required under Rule 9(b). Am. Compl. at Exs. A, B. The fact that Defendants filed a joint brief without differentiating between the Defendants also demonstrates the efficiency in adjudicating this case as a single action. Relator has met his burden in pleading the requisite scienter for each of the Defendants. *See United States ex rel. Streck v. Takeda Pharms. Am., Inc.*, 381 F. Supp. 3d 932, 940 (N.D. Ill. 2019) (relator's complaint against multiple drug manufacturers "sufficiently provides details of the two alleged schemes to satisfy Rule 9(b)"). Defendants' motion should be denied.

## II.    The Public Disclosure Bar Does Not Apply Here.

Defendants contend that the "public disclosure bar" forecloses Relator's suit, but had it not been for Relator Lupinetti, Defendants' fraud would remain undetected. This action is based on the Relator's independent investigation and insider experience at First DataBank – not on any public disclosure. Only someone with Relator's inside industry experience could have identified Defendants' fraud and understood how it impacted government healthcare programs. The public disclosure bar does not apply here.

The public disclosure bar exists "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 295 (2010). As originally enacted, the FCA did not prevent relators from filing lawsuits based on information available in the public domain. This resulted in "parasitic" suits in which relators drafted complaints copying directly from public documents, such as a federal criminal indictment. *See, e.g., U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943).

After *Hess*, the FCA was amended several times to prevent such suits. The current public disclosure bar (31 U.S.C. § 3730(e)(4), as amended in 2010) seeks the "golden mean" between adequate incentives for whistleblowers and preventing copycat lawsuits. *See Graham*, 559 U.S. at 302.

In applying the public disclosure bar, courts employ a three-step analysis. *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 274 (7th Cir. 2016). The court first evaluates whether the "critical elements exposing the transaction as fraudulent" have been publicly disclosed through one of the specified channels. *Id.* If the "critical elements" exposing the fraud were disclosed, the court then determines whether the relator's lawsuit is "based upon" the publicly disclosed information. *Id.* at 280-81. If the first two steps are satisfied, the public disclosure bar applies *unless* the relator is an "original source" of the information upon which the lawsuit is based. *Id.* at 274.

### A. The "Critical Elements" of the Alleged Fraud Were Not Publicly Disclosed.

Defendants suggest that the "critical elements" of the alleged fraud were publicly disclosed for two reasons: (1) Defendants' labeling, product information, and representations to CMS were available in "federal reports," *i.e.*, government websites and databases; and (2) Defendants' labeling and product information were disclosed in the "news media," *i.e.*, Defendants' public websites. *See* Defs. Br. at 10-11. Essentially, Defendants argue that their own labels, marketing

22

materials, and product submissions to the government disclosed the alleged fraud. This is wrong and not how the public disclosure bar works.

These "disclosures" merely confirm that Defendants misrepresented their products to the government and to the public at-large by using false "Rx" and "Rx Only" markings. Defendants' websites and product labeling do not disclose the fraud – they *conceal* it. That is, Defendants' disclosures provide the "misrepresented" facts, but not the "true state of facts." *See U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 655 (D.C.Cir. 1994) (public disclosure of fraud "requires recognition of two elements: a misrepresented state of facts *and* a true state of facts") (emphasis in original); *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1017 (7th Cir. 1999) (proving fraud "requires a comparison between the [defendant's] statements … and the truth [of those statements]").

Nor do any of the government websites or databases that Defendants list reveal the "true state of facts." The Medicaid Drug Rebate Data file (*see* Defs. Br. at 10) contains vast amounts of data about drug products, but it does not disclose Defendants' fraud. It simply reflects what Defendants misrepresented to the government. Likewise, FDA websites contain extensive drug information and product labeling, but they do not disclose the "critical elements" of the alleged fraud. These "disclosures" are far too general and disconnected from any allegations of fraud to trigger the public disclosure bar. *See U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 935 (7th Cir. 2012) (public disclosure bar does not apply where public disclosures are at a "high level of generality").

Defendants' reference to a 2013 FDA citizens petition and related comments is also insufficient. The petition and the comments merely confirm that prenatal products are not FDA approved. *See* Defs. Br. at 10-11. But this case is not about whether Defendants' products are FDA

23

approved, it is about whether Defendants used false information to get prenatal vitamin claims paid under government healthcare programs. Further, the petition does not reference any specific prenatal vitamins, let alone the specific products involved in this case. *See* FDA Letter at 4 (petition references a "class of drug products," and does not involve "any specific finished prenatal vitamin product"). To invoke the public disclosure bar, a disclosure must do more than describe an industry-wide phenomenon without attributing fraud to a particular actor. *See U.S. ex rel. Baltazar v. Warden*, 635 F.3d 866 (7th Cir. 2011) (GAO report revealing fraud in chiropractic industry did not bar relator's claims that a specific chiropractor violated the FCA).

None of Defendants' purported "disclosures" actually disclose that Defendants' products *should not have been labeled "Rx" or "Rx Only."* Or that Defendants' practices *caused* pharmacists, physicians, and consumers to believe that Defendants' products required a prescription. Or that Defendants' false statements to drug compendia companies, such as First DataBank, were fraudulently intended to facilitate Medicaid reimbursement. Defendants' "disclosures" only confirm that Defendants misrepresented their products' prescription status. There has been no disclosure of the "critical elements" of the alleged fraud.

**B.  Relator's Allegations Are Not "Based Upon" a Public Disclosure.**

Even assuming Defendants' websites, product labels, or other sources constitute a public disclosure of the alleged fraud, Defendants fail to show that Relator's complaint is "based upon" or "substantially similar" to any such disclosure. This is because Relator's complaint is *not* based on any public disclosure – it is based on Relator's independent investigation and analysis at First DataBank and experience as a Medicaid fraud prosecutor for the State of New York. Am. Compl. at ¶¶ 2-3, 11, 15, 70-71, 87.

Where a Relator's independent investigation and analysis is necessary to reveal a fraudulent scheme, it cannot be said that the *qui tam* suit is "based upon" or "substantially similar

to" a public disclosure. *See U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 690–91 (7th Cir. 2014). In *Heath*, the Seventh Circuit held the relator's allegations were not substantially similar to the publicly disclosed contract because, "whether publicly disclosed or not . . . [the agreement] is evidence of only one transaction that had to be supplemented with knowledge of other pricing . . . to establish fraud." 760 F.3d at 691.

Similarly, in *U.S. ex rel. Osheroff*, the court refused to apply the bar where an alleged fraud was "hidden in plain sight" in public data disclosed by the defendant. No. 09-22253-CIV, 2012 WL 2871264, at *3 (S.D. Fla. July 12, 2012). "Logic and the plain meaning of the Public Disclosure Bar support the conclusion that to the extent a relator does the work to expose a fraud that would otherwise go undetected, Relator's suit cannot be said to be based on disclosed allegations or transactions." *Id.*

*Heath* and *Osheroff* pave the way for the analysis here. To the extent Defendants' labels and product submissions were public disclosures, Defendants' fraud was "hidden in plain sight," and would have remained hidden had it not been for Relator's suit. Indeed, Defendants largely gloss over the "based upon" requirement. As to Relator's roles at First DataBank and at the New York Attorney General's Office, Defendants limit their discussion to a footnote and summarily contend that Relator did not provide "any relevant inside knowledge." (Defs. Br at p. 12, fn. 8). These arguments are wrong. While at First DataBank, Relator was the quintessential industry insider and ideally situated to identify Defendants' fraud. Defendants reported their prescription status directly to First DataBank, and it was there that Mr. Lupinetti investigated Defendants' representations and independently extrapolated Defendants' fraud scheme. Am. Compl. at ¶¶ 2-3, 11, 15, 70-71, 87.

The public disclosure bar does not apply because Relator's complaint is not based upon any public disclosures of the alleged fraud.

### C. Relator Qualifies as an Original Source.

If Relator qualifies as an "original source," the public disclosure bar does not apply. 31 U.S.C. § 3730(e)(4)(A). An "original source" is an individual who has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government" before filing an FCA action. 31 U.S.C. § 3730(e)(4)(B). Relator Lupinetti satisfies each requirement.

Relator's knowledge is "independent of" and "materially adds" to any purported publicly disclosed information. Relator expended significant resources analyzing and synthesizing Defendants' entries to First DataBank and government entities to expose the Defendants' fraud. Am. Compl. at ¶¶ 2-3, 11, 15, 70-71, 87. "There must be some consideration to the availability of the information and the amount of labor and deduction required to construct the claim." *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1046 (10th Cir. 2004). As in *Kennard*, Relator here "ferreted out the alleged fraud . . . and must, therefore, qualify as an original source." *Id*. Indeed, "Congress wanted to encourage busybodies who, through independent efforts, assist the government in ferreting out fraud." *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999).

In *Lamers*, the Seventh Circuit held that the relator was an "original source," where he "simply walked the streets…. observing the buses in action." *Id*. at 1017. The bus information "was readily available to government investigators … or even to members of the general public…." *Id*. But the relator's "independent efforts" assisted the government in ferreting out fraud. The relator "may be viewed by some as a bit of a busybody with his own agenda, but he is certainly not a parasite." *Id*.; *see also United States ex rel. Howard v. KBR, Inc.*, 471 F. Supp. 3d 846, 855-56 (C.D. Ill. 2020) (relators satisfied "original source" requirements "because they

26

revealed deliberate and systemic failures that [defendant] attempted to cover up"); *United States ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 661 (N.D. Ill. 2015) (Durkin, J.) (relator qualified as "original source" because he had access to defendant's documents and participated in meetings with the defendant, government officials, and other stakeholders).

Like these cases, Relator Lupinetti's independent efforts assisted the government in identifying the alleged fraud. Relator had access to Defendants' submissions to First DataBank, and he met with certain Defendants, government officials, and other stakeholders. Am. Comp. ¶¶ 15, 68. Defendants' "Rx Only" labels were "readily available" to the government and the general public, but it was Relator that investigated, identified Defendants' alleged fraud, and filed this action. The Relator may be viewed as a "busybody," but that's the point of the FCA – to encourage regular people to take action to address fraud against the government. Because of Mr. Lupinetti's independent and substantial efforts, and because he disclosed his claims to the Government before filing this action, Mr. Lupinetti qualifies as an "original source." *See Leveski*, 719 F.3d at 838-39 ("If Lamers's observations *as a total outsider* from the defendant were sufficient . . . then certainly[relator's] observations as a ten-year employee of the defendant are sufficient") (emphasis added).

Defendants' argument that their practice of selling prenatal vitamins without "FDA approval" is "common knowledge," so Relator cannot be an "original source," is unavailing. Defs. Br. at 12. This case is not about FDA approval, so it is irrelevant whether it is "common knowledge." This argument also fails to account for the "hidden in plain sight" analysis, described in *Osheroff*, 2012 WL 2871264, at *3, and *Lamers*, 168 F.3d at 1017. What is "common knowledge" according to the Defendants, is not necessarily common knowledge to pregnant women, physicians, pharmacists, and government employees who may reasonably assume that

products marked "Rx Only" actually require a prescription by law. Nor was it "common knowledge" to drug compendia companies, like First DataBank, that assumed Defendants' submissions were truthful. *See* Am. Compl. ¶ 87 ("When Mr. Lupinetti alerted First Databank that Defendants misrepresented their prescription status, First Databank took swift action to correct the Defendants' false statements.").[4]

Defendants also generally argue that the Government could have taken "responsive action itself." Defs. Br. at 12 (quoting *United States ex rel. McGee*, 81 F. Supp. 3d at 657). This argument also misses the mark. Relator's independent investigation supplied the government with substantial and material information – Relator analyzed Defendant's products and pricing information, he spoke with several of Defendants' representatives to determine the basis for any "Rx Only" marking, he consulted with pharmacists, and he analyzed Defendants' submissions to CMS, First DataBank, and others. *See, e.g.*, Am. Compl. ¶¶ 2-3, 11, 15, 70-71, 87. The FCA is designed to encourage individuals to do exactly what Relator Lupinetti did – ferret out fraud and bring that information to the Government. Whistleblowers like Relator should be encouraged, not turned away at the courthouse. This is not a copycat lawsuit and the public disclosure bar should not apply.

### III.    Any Dismissal Should Be Without Prejudice.

This case should not be dismissed, but if the Court identifies any deficiencies in the pleading, Relator requests the ability to amend the complaint. *See* Fed. R. Civ. P. 15(a)(2) (the Court "should freely give leave to amend when justice so requires"). Courts regularly provide

---

[4] Defendants also cite *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 282 (7th Cir. 2016), but the facts there do not apply. Defs. Br. at 12. In *Cause of Action*, the relator did not conduct any independent investigation or analysis but instead relied entirely on *someone else's* report for the Illinois Auditor General.

plaintiffs an opportunity to cure pleading deficiencies after ruling on an initial motion to dismiss. *See United States v. Am. at Home Healthcare & Nursing Servs., Ltd.*, No. 14-CV-1098, 2017 WL 2653070, at *17 (N.D. Ill. June 20, 2017); *U.S. ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872, 882 (N.D. Ill. 2012) ("Relator has sought leave to amend his Complaint…. [T]his is the first complaint actually challenged by motions to dismiss. Because Defendants have only had to answer once, and because the Court does not believe amendment would necessarily be futile, it grants leave to replead."). Defendants rely on *United States ex rel. Bellevue v. Universal Health Servs. of Hartgrove Inc.*, Defs. Br. at 23, but in *Bellevue*, the Court initially dismissed the complaint *without* prejudice and gave the plaintiff a chance to file an amended complaint before finally dismissing with prejudice. 2015 WL 5873292 (N.D. Ill. Oct. 5, 2015). This case should not be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.


August 2, 2021                                     Respectfully submitted,

                                                  BEHN & WYETZNER, CHARTERED

                                                  /s/ Linda Wyetzner
                                                  Linda Wyetzner
                                                  lwyetzner@behnwyetzner.com
                                                  Daniel Hergott
                                                  dhergott@behnwyetzner.com
                                                  10 N. Dearborn Street
                                                  6th Floor
                                                  Chicago, IL 60602
                                                  Tel/Fax: (312) 629-0000

THE TERRY LAW FIRM, LTD.

/s/ Tim Terry
Tim Terry
tim@theterrylawfirm.com
170 Reiten Drive
Ashland, OR 97520
Tel: (775) 291-9071

HOWARD LAW, LLC

/s/ Bruce Howard
Bruce Howard
bhoward@howardlaw.llc
10 N. Dearborn Street
6th Floor
Chicago, IL 60602
Tel: (312) 236-0000
Fax: (312) 878-1342

*Counsel for Relator Patrick Lupinetti*

**<u>Certificate of Service</u>**

      This is to certify that on August 2, 2021, I electronically filed the foregoing with the Clerk

of the Court using the ECF system, which will send notification of such filing to all counsel of

record.

Dated: August 2, 2021               Respectfully Submitted,

                                /s/ Dan Hergott